**AYALA LAW, P.A.**
1390 Brickell Ave, Ste 335
Miami, FL 33131
(305) 570-2208
Eduardo A. Maura, Esq.
eayala@ayalalawpa.com
Luis F. Quesada, Esq.
lquesada@ayalalawpa.com
*Counsel to TM Solutions USA LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
In re:                                                          :
                                                                :   Case No. 20-11254-JLG
LATAM Airlines Group S.A., et al.,                              :
                                                                :   Chapter 11
    Debtors.                                  :
---------------------------------------------------------------x
TM Solutions USA LLC,                                           :
                                                                :   Adv. Pro. No.
    Plaintiff,                                :
                                                                :   CLASS ACTION
v.                                                              :
                                                                :   JURY TRIAL DEMANDED
LATAM Airlines Group S.A. Inc.,                                 :
                                                                :
    Defendant.                                :
---------------------------------------------------------------x

### CLASS ACTION COMPLAINT

Plaintiff TM Solutions USA LLC ("TM Solutions"), individually and on behalf of all others similarly situated, by and through its counsel, brings this adversary proceeding against Defendant LATAM Airlines Group S.A. Inc. ("LATAM"), a Debtor in the above-captioned bankruptcy case, and alleges, upon its own knowledge or upon information and belief, as follows:

### INTRODUCTION

Traveling can be a pleasurable experience, even when done for work. The change in scenery from the routine of the workplace can add a little motivation to the sometimes monotonous, long

workdays. The logistics of travelling are, however, never simple. Early arrivals at airports, check-ins, luggage size issues, luggage misplacement problems, long security check lines, delays, and the ultimate fear of every traveler: cancellations. Now, cancellations are bad enough when they occur due to unforeseen reasons like weather, malfunctions, or a global pandemic. Consumers suffer, but most understand that there are circumstances beyond an airline's control. This sort of cancellations is not the subject of this lawsuit. This lawsuit is about an airline intentionally, and as a matter of policy, cancelling tickets for flights that consumers already paid for, without their consent, in order to resell them and enrich itself—all at the expense of stranded consumers.

## PARTIES

1. TM Solutions is a Limited Liability Company formed under the laws of Florida and does business in Miami, FL. Pedro Egusquiza ("Egusquiza") is the owner and managing member of TM Solutions.

2. LATAM is a Corporation that is incorporated in the Republic of Chile and has its principal place of business in Santiago, Chile. At all relevant times, LATAM was doing business in Miami, FL. LATAM is an international commercial air carrier that operates under the brand name "LATAM Airlines."

3. LATAM conducts extensive operations in the United States, particularly in Florida. In 2015, LATAM inaugurated a 98,242 sq. ft maintenance facility at Miami International Airport ("MIA").[1] LATAM is considered the busiest airline for cargo and the third busiest for passengers at MIA.[2] Besides Florida, LATAM also operates in California, Massachusetts, New York, and the District of Columbia.

---

[1] *See* https://www.miamiherald.com/news/business/article50193715.html (last visited on August 18, 2020).
[2] *Id.*

Class Action Complaint                                                                                             2

## JURISDICTION AND VENUE

4. This is a class action lawsuit for damages within the jurisdiction of this Court.

5. This adversary proceeding is commenced pursuant to Fed. R. Bankr. P. 7001. This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Additionally, this Court has jurisdiction pursuant to 28 U.S.C. § 1331 because some of TM Solutions' claims are brought under the Convention for the Unification of Certain Rules for International Carriage by Air (the "Montreal Convention"). Specifically, this Court has jurisdiction under Art. 33(1) of the Montreal Convention.

6. Venue is proper in this district under 28 U.S.C. § 1409. This adversary proceeding is related to a Chapter 11 bankruptcy case (*In re LATAM Airlines Group S.A., et al.*; Case No. 20-11254-JLG) pending in this district.

7. TM Solutions consents to entry of a final order or judgment by the Bankruptcy Court in this matter.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS

8. TM Solutions is a company dedicated, primarily, to the wholesale of fresh produce in the United States and other international markets.

9. On or about February 13, 2020, in his capacity as managing member and owner of TM Solutions, Egusquiza had to travel to Miami, FL, for business meetings with one of TM Solutions' main partners in the United States.

10. Due to the nature of the meetings, Egusquiza called Andres Guerrero ("Guerrero"), a food industry professional working for a TM Solutions affiliate in Lima, Peru, to travel with him

for the meetings. Egusquiza requested his assistant, Talia Peschiera ("Peschiera"), to purchase flights on the route LIM[3]-MIA-LIM for both of them.

11.     On or about February 14, 2020, Peschiera proceeded to purchase Egusquiza and Guerrero's flights. Peschiera was supposed to purchase flights departing from LIM on the early hours of February 19, 2020 and returning from MIA on the early hours of February 21, 2020. However, Peschiera inadvertently purchased the inbound flights for February 18, 2020, at 12:15AM rather than February 19, 2020, at a similar time.

12.     TM Solutions paid $2,280 for Egusquiza and Guerrero's roundtrip tickets.

13.     Realizing the error, Peschiera called the customer service center of BudgetAir.com, ("BudgetAir"), an online retailer LATAM uses to sell flights. BudgetAir agents told Peschiera that: (1) replacement tickets for the mistakenly purchased inbound flights were around $1,800 and (2) that she should call LATAM directly to solve the problem.

14.     Peschiera, as instructed, called LATAM, which in turn told her to call BudgetAir saying BudgetAir was the one that had to solve the problem.

15.     Given the useless back-and-forth from one entity to the other, and after multiple calls, Peschiera proceeded to look for flights on the internet to replace the mistakenly purchased LIM-MIA flights.

16.     Peschiera was able to find substitute LIM-MIA flights for Egusquiza and Guerrero in American Airlines for $420 each. Given the drastic difference between changing flights with LATAM ($1,800) and buying new one-way inbound flights, Peschiera, in consultation with Egusquiza, proceeded to purchase the less expensive replacement flights—as most reasonable consumers would.

---

[3] Jorge Chávez International Airport in Lima, Peru.

17. Importantly, Peschiera, in her call with LATAM, told the customer service agent what she was going to do—i.e., that given the difference in flight prices, she would purchase new one-way inbound flights in the open market for Egusquiza and Guerrero.

18. At no point was Peschiera told that this would be a problem, or that it would have any impact on the existing reservation.

19. At all times, Peschiera told both LATAM and its agents at BudgetAir that Egusquiza and Guerrero were not going to use the inbound LIM-MIA flights.

20. On February 20, 2020, Peschiera attempted to complete the check-in for Egusquiza and Guerrero's outbound flight in LATAM's website. To her surprise, there was no available reservation with the original LATAM reservation code.

21. Peschiera called BudgetAir, which in turn told her to call LATAM, which in turn told her to call BudgetAir again. Both LATAM and BudgetAir told Peschiera that it is the policy of LATAM to cancel complete reservations (the entire roundtrip) once a passenger does not board the inbound flight (a so called "no-show" policy). Peschiera asked to speak to LATAM supervisors but they would not speak to her.

22. Frustrated, and with no other options, Peschiera told Egusquiza about the LATAM fiasco. Egusquiza then, stranded in Miami, proceeded to search for MIA-LIM flights for him and Guerrero since both had to return to Lima that same day or in the early hours of February 21, 2020.

23. Unfortunately, there were no direct MIA-LIM flights. The only option Egusquiza could find was a MIA-BOG[4] flight in Avianca on February 21, 2020, at 12:45AM and then an additional flight from Bogotá to Lima at 06:25AM. The total cost for these flights was $1,526.

---

[4] El Dorado International Airport in Bogotá, Colombia.

24. At no point did LATAM ask TM Solutions, or any of its agents (Peschiera, Egusquiza, or Guerrero), for consent to cancel the already paid-for MIA-LIM return flights.

25. At no point did TM Solutions, or any of its agents, tell LATAM that it could resell the return flights that had already been paid for by TM Solutions.

26. It would be very inexpensive and simple for LATAM to request their consumers' consent to resell or cancel flights that consumers will not use, but LATAM, as a matter of policy, does not obtain this consent because it would deprive LATAM of a rather profitable resale scheme under its current "no-show" policy, whereby LATAM nets the price of a single flight twice, enlarging its already formidable bottom line.[5]

## CLASS ACTION ALLEGATIONS

27. Plaintiff repeats and realleges paragraphs 1 through 26, as if fully set forth herein.

28. Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23(b)(2), (3), and (c)(4), as made applicable to this adversary proceeding by Fed. R. Bankr. P. 7023.

29. Plaintiff seeks certification of the following *Multistate Class*:

    **All residents of the States of California, Florida, Massachusetts, New York, and the District of Columbia who purchased a roundtrip ticket with LATAM whose flights were cancelled by LATAM without their consent within the applicable limitations period.**

30. Plaintiff also seeks certification of the following *Florida Subclass*:

    **All residents of the State of Florida who purchased a roundtrip ticket with LATAM whose flights were cancelled by LATAM without their consent within the applicable limitations period.**

31. Excluded from these classes are LATAM, its affiliates, subsidiaries, agents, board members, directors, officers, employees, and/or their family members.

---

[5] In 2018, LATAM reported $9.8 billion in revenue, $758 million in operating income, and $213 million in net income. In 2019, LATAM reported $190 million in operating income. *See* http://www.latamairlinesgroup.net/results-center (last visited on August 18, 2020).

*Numerosity*

32.     This class action satisfies the numerosity requirement of Fed. R. Civ. P. 23(a)(1). The classes defined in this Class Action Complaint are sufficiently numerous that separate joinder of each member is impracticable as the classes will include thousands of members.

*Commonality*

33.     This class action satisfies the commonality requirement of Fed. R. Civ. P. 23(a)(2), as the claims raise questions of law and fact common to each member of the classes, which include, without limitation:

(a) Whether LATAM's "no-show" policy unjustly enriches LATAM.

(b) Whether LATAM's "no-show" policy makes LATAM liable to the class members under the Montreal Convention.

(c) Whether LATAM breached its contracts with the class members when it did not provide flights for which it had already received payment.

(d) Whether LATAM's "no-show" policy is unconscionable.

(e) Whether LATAM should be required to obtain consent before cancelling the class members' already-purchased flights.

(f) Whether LATAM's "no-show" policy is unfair and/or deceptive.

*Typicality*

34.     This class action satisfies the typicality requirement of Fed. R. Civ. P. 23(a)(3), as the claims made by TM Solutions are similar to those of the class members. For example, most class members were stranded in airports due to LATAM's unilateral cancellations, had to purchase replacement flights, and incur additional costs that they would not have otherwise.

*Adequacy*

35.     This class action satisfies the adequacy requirement of Fed. R. Civ. P. 23(a)(4) because TM Solutions, through its agents, will fairly and adequately protect and represent the

interests of each class member, since it has suffered the same wrongs as the class members.

36. TM Solutions and its agents are well aware of their responsibilities as a class representative and have retained Ayala Law, P.A., which is experienced in complex litigation and has the necessary resources to meet the costs and requirements of a case of this nature.

*Predominance*

37. The prerequisites for maintaining a class action under Fed. R. Civ. P. 23(b)(3) also exist because there are questions of law or fact common to all class members that predominate over any questions affecting only individual members. These questions include, without limitation:

(a) Whether LATAM's "no-show" policy unjustly enriches LATAM.

(b) Whether LATAM's "no-show" policy makes LATAM liable to the class members under the Montreal Convention.

(c) Whether LATAM breached its contracts with the class members when it did not provide flights for which it had already received payment.

(d) Whether LATAM's "no-show" policy is unconscionable.

(e) Whether LATAM should be required to obtain consent before cancelling the class members' already-purchased flights.

(f) Whether LATAM's "no-show" policy is unfair and/or deceptive.

*Superiority*

38. This class action satisfies the superiority requirement of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this controversy for a variety of reasons, including, without limitation, that it would be an inefficient use of judicial resources to require each class member affected by LATAM's actions to bring its own claim. Moreover, the case deals with common issues of law that may be adjudicated uniformly in one single action without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would require.

*Class action under Fed. R. Civ. P. 23(b)(2)*

39. The prerequisites for maintaining a class action under Fed. R. Civ. P. 23(b)(2) exist because by non-consensually cancelling the class members' already-paid-for flights, LATAM has acted or refused to act on grounds that apply to the entire class, making injunctive and equitable relief appropriate.

40. Specifically, TM Solutions seeks an order declaring that LATAM's "no-show" policy is deceptive, misleading, and that it violates applicable federal and state laws causing damages to the class members. TM Solutions requests an injunction against LATAM, preventing it from further taking advantage of unsuspecting class members through its "no-show" policy.

## COUNT I – DECLARATORY ACTION
*28 U.S.C. § 2201, et seq.*
(On Behalf of the *Multistate Class*)

41. Plaintiff repeats and realleges paragraphs 1 through 40, as if fully set forth herein.

42. TM Solutions currently has an actual and justiciable controversy between it, as representative of a class of plaintiffs, and LATAM.

43. Specifically, TM Solutions has a question of what its rights are vis-à-vis LATAM. TM Solutions believes that LATAM's "no-show" policy is void and unenforceable as a matter of law. TM Solutions believes that LATAM's "no-show" policy is unconscionable and that LATAM should be required to obtain consumers' consent before cancelling flights that consumers already paid for and that they expect to use.

44. TM Solutions' doubts are bona fide and are primarily born out of the losses and waste of money incurred as a result of what it believes is LATAM's conduct or neglect of their responsibility to fulfill its promises to it and other class members.

45. LATAM will contend that it disclosed its "no-show" policy and that the "no-show" policy is enforceable.

46. Because of the diametrically opposed views of the parties, there is an actual, present need for this Court's declaration.

47. The unsettled state of affairs between the class members and LATAM creates a financial burden on class members who purchased (and will continue to purchase) LATAM's flights, unaware of the risks they face in the event they cannot complete one leg of their flights, and LATAM charges them more than the open market to replace one-way flights.

WHEREFORE, based on the allegations in this Count I of this Class Action Complaint, TM Solutions demands a judgment against LATAM declaring:

(a) That LATAM's "no-show" policy is void and unenforceable;

(b) That LATAM has an affirmative duty to request a consumer's consent before cancelling paid trips; and

(c) Any such other and further relief as this Court may deem just and proper.

## COUNT II – VIOLATION OF THE MONTREAL CONVENTION
(On Behalf of the *Multistate Class*)

48. Plaintiff repeats and realleges paragraphs 1 through 40, as if fully set forth herein.

49. LATAM is a "carrier" within the meaning of the Montreal Convention.

50. Under Art. 19 of the Montreal Convention, "[t]he carrier is liable for damage occasioned by delay in the carriage by air of passengers," unless the carrier "took all measures that could reasonably be required to avoid the damage" or it was impossible for it to take such measures.

51. When LATAM cancelled TM Solutions' MIA-LIM flights, despite TM Solutions having warned LATAM that Egusquiza and Guerrero were not going to board the LIM-MIA flight, LATAM violated Art. 19 of the Montreal Convention.

52. When LATAM, after learning that Egusquiza and Guerrero were not going to board the LIM-MIA flight, cancelled their MIA-LIM return flights, LATAM caused damages that were easily avoidable.

53. When LATAM cancels flights that consumers already paid for, without first obtaining their consent, and leave consumers stranded, scrambling for expensive last-minute flights, LATAM violates Art. 19 of the Montreal Convention.

54. It would be very easy for LATAM to request consent from TM Solutions and other class members before cancelling their flights and take appropriate measures to avoid unsuspecting consumers being stranded at the airport. For example, LATAM could have called or texted Peschiera, Egusquiza, or Guerrero, and requested consent to cancel their flights.

55. It would be unreasonable to force class members to purchase a more expensive replacement flight with LATAM rather than purchase a more economical option with another airline to replace one leg of a trip in situations where consumers, for one reason or another, cannot board their original flights.

56. LATAM's violation of the Montreal Convention caused damages to TM Solutions and other similarly situated class members.

WHEREFORE, TM Solutions requests a judgment for statutory damages as prescribed by the Montreal Convention, prejudgment interest, attorney's fees and costs, and any other relief that the Court deems just and equitable.

## **COUNT III – UNJUST ENRICHMENT**
(On Behalf of the *Multistate Class*)

57.   Plaintiff repeats and realleges paragraphs 1 through 40, as if fully set forth herein.

58.   TM Solutions brings this claim on behalf of the *Multistate Class* as there are no true conflicts (i.e., case-dispositive differences) among the various states' unjust enrichment laws. *See* **Appendix A**. In the alternative, TM Solutions brings this claim under the laws of the states where TM Solutions and other class members reside and/or purchased their tickets.

59.   TM Solutions conferred a benefit on LATAM in the form of payments for two roundtrip tickets for the route LIM-MIA-LIM.

60.   LATAM knowingly and voluntarily accepted this benefit by collecting payment from TM Solutions as well as every time a class member purchases a roundtrip ticket.

61.   LATAM did not provide the class members all or part of the service they paid for, while retaining the class members' payments.

62.   Moreover, on information and belief, LATAM resold the class members' flights in the open market and profited twofold or more on seats that belonged to the class members, who were left stranded at airports having to scramble for last-minute expensive flights to obtain what LATAM took from them.[6]

63.   As a result, LATAM benefited by being unjustly enriched from the payments they received from thousands of consumers, while not providing these consumers with at least one leg of their flights, and instead reselling the seats.

---

[6] LATAM does not lose any money by flying with the class members/consumers' seats empty because these seats were already paid for. Moreover, in a scenario where consumers do not make it to both legs of their trips, LATAM would spend less fuel because it would be carrying less weight while having been paid for the seat in full.

WHEREFORE, TM Solutions requests an order declaring that LATAM was unjustly enriched, for monetary damages, prejudgment interest, attorney's fees and costs, and any other relief that the Court deems just and equitable.

### COUNT IV – VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
*§ 501.201 et seq., Fla. Stat.*
(On behalf of the *Multistate Class* or, alternatively, the *Florida Subclass*)

64. Plaintiff repeats and realleges paragraphs 1 through 40, as if fully set forth herein.

65. This is an action for LATAM's violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

66. FDUTPA renders unlawful any "unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat. Under FDUTPA, "trade or commerce" is defined to include the "advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service." § 501.203(8), Fla. Stat.

67. TM Solutions and other class members are consumers within the meaning of FDUTPA.

68. LATAM's actions were unfair and deceptive in that they gouge the price for changing flights in such a way that forces consumers to purchase flights with other airlines when they cannot make one leg of their roundtrip reservation.

69. LATAM's actions were unfair and deceptive in that they resell flights that were already paid for by the class members and that the class members intended to use.

70. LATAM's actions were unfair and deceptive in that they intentionally do not request a consumer's consent to cancel their flights, so it can then resell the class members' seats and make twice or more the money on the same seat.

71. LATAM's actions were unfair and deceptive in that it is in the best position to obtain a consumer's consent before cancelling and reselling flights already paid for by the class members. LATAM, however, has no interest in obtaining consumers' consent, as evidenced by the fact that even when TM Solutions' agents warned LATAM and its agents that Egusquiza and Guerrero were not going to board the inbound LIM-MIA flights and that it was going to purchase one-way replacement flights for them, LATAM still cancelled flights that it knew or should have known TM Solutions intended and needed to use.

72. LATAM's actions violate FDUTPA because it is extremely unfair that the class members have to pay exorbitant prices for last-minute flights, when they had already paid LATAM for flights, and they did not give LATAM permission to cancel them or resell them.

73. A reasonable consumer has a reasonable expectation of having the ability to use return flights even if he or she, for one reason or another, cannot board the original inbound flight.

74. When LATAM, without obtaining a consumer's consent, cancels flights for which it already received full payment, it engages in a practice that is deceptive and unfair.

75. LATAM's acts, as described *supra*, are to be considered unconscionable, deceptive, or unfair acts or practices as defined by FDUTPA.

76. As a direct and proximate cause of LATAM's unlawful acts, TM Solutions and the members of the Multistate Class or, alternatively, the Florida Subclass have been damaged in that they have sustained losses that they would otherwise not have sustained but for LATAM's actions.

WHEREFORE, TM Solutions requests an order for monetary damages for LATAM's violation of FDUTPA, prejudgment interest, attorney's fees and costs pursuant to § 501.211(2), Fla. Stat., an injunction against LATAM, and any other relief that the Court deems just and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims so triable.

Dated: August 18, 2020

                                                Respectfully submitted,

                                                Eduardo A. Maura, Esq.
                                                Luis F. Quesada, Esq.
                                                *Attorneys for Plaintiff*
                                                **Ayala Law, P.A.**
                                                1390 Brickell Ave, Ste 335
                                                Miami, FL 33131
                                                Telephone: 305-570-2208
                                                Email: eayala@ayalalawpa.com

                                                By: */s/ Eduardo A. Maura*
                                                      Eduardo A. Maura
                                                      Florida Bar No. 91303